**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FJONA DAJLANI and ALLISON EGAN, individually and on behalf of all others similarly situated,<br><br>                        Plaintiffs,<br><br>   v.<br><br>BABY GENERATION, INC.,<br><br>                       Defendant. | Civil Action No.: 1:23-cv-3394<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.  Plaintiffs Fjona Dajlani and Allison Egan ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against defendant Baby Generation, Inc. ("Defendant" or "Baby Generation") for making and then marketing, and distributing defective "Mockingbird" branded Single-to-Double Strollers and Single Strollers (the "Strollers") throughout the United States. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief – based upon, *inter alia*, the investigation made by their attorneys – as to all other matters, as follows:

2.  The Single-to-Double strollers, with the use of an extra attachment, are able to seat two newborns or toddlers, and are generally sold for $450:




3.     The Single Strollers seat one newborn or toddler and retail for around $400:




4.     The Strollers do not meet minimum standards of operating with the necessary level of safety due to a defective, unstable frame that has caused the Strollers to crack, at times causing children to fall from the Strollers. This very dangerous defect, which Defendant knew of or should have known and warned customers about has been experienced and reported by disappointed consumers who experienced these defects firsthand after the point of sale.   No reasonable

consumer would purchase a premium, expensive stroller to transport babies and toddlers that has or could develop a serious safety defect.

5.     While some consumers can no longer use their strollers because of the defect, others, whose strollers do not contain damage at this time, now fear for their children's safety. Instead of providing a refund for customers with the Strollers, Defendant has offered a frame reinforcement kit purportedly intended to prevent the Strollers from future breaks. Through this suit, Plaintiffs request a full refund and/or applicable damages on these expensive strollers, as well as all other appropriate relief.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),  provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Defendant because it has continuous and systematic contacts with this forum, maintains its corporate headquarters in this District, and the events giving rise to this matter arose of those contacts.

8.     Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information and omissions regarding the Strollers, occurred within this District.  Defendant is also headquartered in this District.

## PARTIES

**A.     Plaintiff Fjona Dajlani**

9.      Plaintiff Fjona Dajlani is an individual consumer who, at all times material hereto, was a citizen of New York.

**B.     Plaintiff Allison Egan**

10.     Plaintiff Allison Egan is an individual consumer who, at all times material hereto, was a citizen of Massachusetts.

**C.     Defendant Baby Generation, Inc.**

11.     Defendant Baby Generation, Inc. is a Delaware corporation with its principal place of business and headquarters in Brooklyn, New York. Defendant has sometimes assumed and/or done business under the brand name Mockingbird while developing, marketing, and selling its strollers. Defendant manufactures, markets, and distributes the Strollers throughout New York and the United States.

## FACTUAL ALLEGATIONS

**A.     Baby Generation, Inc. Strollers and Representations**

12.     Baby Generation develops, manufactures, and sells baby carriages, strollers, and stroller accessories. As noted above, the Baby Generation strollers at issue in this case are the Single-to-Double Stroller and Single Stroller, sold under the brand name Mockingbird. The Strollers are sold online at hellomockingbird.com (Defendant's website)[1], target.com, and babylist.com and sold in person in select Target stores throughout the United States.

13.     The Single to Double Strollers are marketed to safely carry babies and toddlers up to 45 pounds in each seat. They are "expandable" and "multi-function[al]", allowing them to be

---

[1] Unless otherwise noted, the graphics and quotes included from Defendant's website refer to this web address.

paired with the "2ⁿᵈ Seat Kit" to carry two children. With a third attachment, the stroller can be used with three children. The third attachment is a "Rider Board", that looks like a scooter and is attached to the back of the stroller, to the left of where the parent pushes the Stroller. This attachment is recommended for children three to five years old and supports up to 55 pounds. As shown below:



14.     The Defendant knows that safety is the paramount consideration of parents purchasing and using its Strollers.  As advertised on Defendant's own website, the Strollers are "meticuously designed for safety" and "exceed the highest testing standards":

## Thoughtfully designed, rigorously tested.

Mockingbird strollers are meticulously designed for safety, and we go above and beyond to ensure that our products meet or exceed the highest testing standards.

15.     Defendant represents that the frame has been tested in simulations of irregular surfaces, such as walking over bumps for 72 hours. Defendant also represents that the Strollers have also been tested for a period of 300 hours, undergoing repeated impact and 10,000 simulated

sidewalk    curb    maneuvers    to    ensure    it    can    withstand    knocks    and    bangs:



## Frame

The irregular surface test simulates walking over bumps for 72 hours; we test for a period of 300 hours. (That's a lot of coffee runs, right?) Our stroller also undergoes repeated impact and 10,000 simulated sidewalk curb maneuvers to ensure it can withstand any knocks and bangs that may come.

16.    Defendant also represents that it follows rigorous testing and safety protocols, including those set forth by the Consumer Product Safety Commission ("CPSC") and ASTM International:

**What testing and safety protocols do you follow?**

We meet (and often exceed) the highest governmental regulations set by the Consumer Product Safety Commission (CPSC) and ASTM International, most recently the ASTM F833-15 standard. Additionally, we choose to certify our products with the Juvenile Product Manufacturers Association (JPMA), and submit all of our fabrics and materials to testing for harmful substances such as lead, phthalates, mercury, and cadmium.

17.    Despite Defendant's representations about its testing and safety compliance, in use the Strollers do not meet the bare minimum standards of operating with the usual and expected level of safety due to a defective, unstable frame that has caused the Strollers to crack and become unusable. These cracks have led to the risk of as well as actual injuries. This defect renders the Strollers worthless and unusable for their intended purpose.

**B.    The Defect and Recall**

18.    As noted above, despite Defendant's representations, the Strollers have developed cracks in the side of their frame, that have allegedly led to falls and injuries and pose a risk of these dangerous events occurring.

19.     On October 28, 2022, Consumer Reports safety experts reportedly "urged" Defendant to recall the strollers after dozens of parents shared stories about the stroller suddenly breaking during normal use.[2]  Consumer Reports states that: "Posts on social media and reports submitted to the CPSC describe how some customers had their strollers break without warning while carrying two children, sometimes in the middle of busy city streets. Some parents shared stories about the stroller breaking so suddenly while in motion that their small children, still strapped in their stroller seats, were thrown to the ground."[3]

20.     After Consumer Reports reported on this issue and asked the company about the incidents, Defendant reportedly told consumers that they should inspect the sides of their stroller frames for cracks.[4] Defendant reportedly told Consumer Reports that the problem was "rare" but that it was working with the CPSC to investigate the incidents and decide on the "next steps." In the meantime, Defendant reportedly continued to sell the strollers.[5]

21.     Not long after, Defendant stated that they were conducting a voluntary recall on certain Single-to-Double Strollers due to these cracks in the frames of these Strollers.

22.     Then, on March 17, 2023, Defendant expanded its recall to include certain Single Strollers.[6]

23.     For all Strollers included in the recall, which could be located by their lot number, Defendant was offering a free "Frame Reinforcement Kit", which includes two small clamps that

---

[2] *See* https://www.consumerreports.org/babies-kids/baby-product-recalls/mockingbird-single-to-double-stroller-recall-a3756958718/ (last accessed May 3, 2023).

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

attach to the Stroller's frame and help prevent future cracks.[7] According to Defendant, it worked

on this recall with the US Consumer Products Safety Commission.[8]

24.      Defendant reportedly offered anyone who owns a Stroller with a relevant lot

number to request and use a Frame Reinforcement kit to prevent these cracks[9]:

> At Mockingbird, our top priority is (and always has been) to ensure the safety of you and
> your little ones. We regularly test our strollers above and beyond the required industry
> standards, and constantly seek opportunities in our products and testing programs to
> create even safer strolling.
>
> Despite surpassing the highest governmental regulations for stroller safety, we
> concluded that under certain circumstances, hairline cracks could potentially form in
> the stroller frame, and with continued use, pose a fall risk to the children in the stroller.
> Because of this, out of an abundance of caution we chose to conduct a voluntary recall
> in partnership with the U.S. Consumer Product Safety Commission.
>
> Although this issue is very unlikely to occur, even the small possibility is preventable by
> installing our free Frame Reinforcement Kit.
>
> **Please use the "Confirm my Lot Number" button below to check if your stroller's
> Lot Number is included in this voluntary recall**. If it is, you'll be prompted to request a
> free Frame Reinforcement Kit, which includes two small steel clamps that attach to your
> stroller frame and provide an additional layer of strength and durability. The U.S.
> Consumer Product Safety Commission has reviewed the kit's effectiveness in preventing
> this rare issue from being able to occur, and has approved it as the official solution for
> this voluntary recall.

# Request a Frame Reinforcement Kit

Please click the button below to check if your stroller model is included in the recall and
to request your free Frame Reinforcement Kit.

---

[7] *Id.*

[8] *Id.*

[9] *See* https://hellomockingbird.com/pages/recall (last visited May 3, 2023).

25.     However, the recall was and is inadequate especially because there is no guarantee that the reinforcement kit will prevent the main components of the Stroller from continuing to crack, degrade, and/or cause injuries to children.  Indeed, given that the reinforcement kit is made by the Defendant, it may also suffer from the same defects. Importantly, the recall doesn't include refunds for the Strollers so that parents can get rid of the defective Strollers and replace it with a safe, non-defective stroller made by another manufacturer.

26.     As reportedly detailed by one consumer of the Strollers: "[i]t's disappointing that Mockingbird isn't offering its customers a refund as a part of this recall…[a] repair is fine for parents who want to keep their stroller, but if there's a parent who is uncomfortable using the product for their child, they should be able to get their money back."[10]

27.     Another consumer who allegedly had three frames break in a row before she finally gave up on the Strollers, reportedly stated that "the reinforcement kit is ridiculous[.] As a parent, I want a product that is strong enough to start, not one I have to add extra material to make safe. It's putting a Band-Aid on a broken bone."[11]

28.     Parents reportedly described their experiences as terrifying close calls as evidenced by these photos showing the defect: [12]

---

[10] *See* https://www.consumerreports.org/babies-kids/baby-product-recalls/mockingbird-single-to-double-stroller-recall-a3756958718/#:~:text=The%20stroller%20company%20Mockingbird%20recalled%20about%20149%2C000%20of,injuries%2C%20according%20to%20the%20Consumer%20Product%20Safety%20Commission (last accessed May 3, 2023).

[11] *Id.*

[12] *Id.*



Ealeal Ginott of Queens, N.Y., says her Mockingbird stroller suddenly broke in half while she was pushing two children across a busy city street.
Photo: Ealeal Ginott



29.    In fact, one consumer allegedly experienced the defect after Defendant had already replaced her Single-to-Double Stroller, stating in a complaint on the CPSC website on

September 14, 2022, and sent to Defendant by the CPSC on September 19, 2022, that when out walking the "[S]troller snapped in half and they both fell to the ground."[13]

30.     What's more, parents describe two types of breaks happening most frequently.[14] The more significant one, where a side of the frame snaps and causes the stroller to collapse, is what the recall addresses and the frame reinforcement kit is meant to prevent.[15] Another type of break, involving a snapped support bar above the basket of the stroller, isn't addressed by the recall.[16] A Mockingbird spokesperson previously told Consumer Reports that this smaller part of the frame "is not critical for the stroller's structural integrity."[17]  These issues challenge the efficacy of the alleged reinforcement kit or whether any purported repair or reinforcement could ultimately salvage the Stollers and make them fit and safe for their ordinary use.

**C.      Additional Negative Consumer Stroller Reviews**

31.     Prior to and following the recall there were a series of negative reviews about the Strollers. Prior to the recall, one review reportedly states that Consumer Reports' safety experts requested Defendant recall the Strollers "following dozens of reports from parents that their strollers had broken in dangerous ways. In at least two instances, sudden breaks caused small children to fall face down on the pavement at busy intersections ".[18]

---

[13] *See* https://saferproducts.gov/PublicSearch/Detail?ReportId=3900776 (last accessed May 3, 2023).

[14] *See* https://www.consumerreports.org/babies-kids/baby-product-recalls/mockingbird-single-to-double-stroller-recall-a3756958718/#:~:text=The%20stroller%20company%20Mockingbird%20recalled%20about%20149%2C000%20of,injuries%2C%20according%20to%20the%20Consumer%20Product%20Safety%20Commission (last accessed May 3, 2023).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *See* https://www.consumerreports.org/babies-kids/strollers/mockingbird-still-selling-strollers-parents-say-break-in-half-a1052525449/ (last accessed May 3, 2023).

32.     The review references Defendant's social media post on Twitter, notifying customers of these complaints but considering them isolated events.[19] Defendant instructed all customers to inspect their Strollers for cracks and to stop using the Strollers and reach out to the Customer Experience team if cracks developed.[20] Although some Strollers were replaced,  many customers expressed on social media that they still feared using the new Stroller.[21]  Customers expressed concern that the Strollers might not show cracks before breaking and some shared their own experiences with sudden breaks in the Strollers' frame.[22] Importantly, informing consumers that they need to wait until a Stroller cracks before taking any further safety precautions does very little to dispel the safety concerns presented by the defective Strollers and continues to put thousands of babies and toddlers at risk of injury.

33.     Another review reportedly discusses flaws in the Defendant's behavior leading up to the recall process where the customer "saw from the very beginning that the strollers were cheaply made".[23] The customer complains that Defendant treats these as "isolated incidents", when this has been a problem for hundreds of customers.[24] Customer reviews reportedly called Defendant's response to these incidents "shady" since for a while Defendant was replacing the

---

[19] *Id.*

[20] *See* https://twitter.com/mockingbird_us/status/1586001445144272896 (last accessed April 26, 2023).

[21] *See* https://www.consumerreports.org/babies-kids/strollers/mockingbird-still-selling-strollers-parents-say-break-in-half-a1052525449/ (last accessed May 3, 2023).

[22] *Id.* (A concerned customer stating, "Who's to say it will show cracks before breaking… Accidents happen, but head injuries aren't pleasant either." and another describing a dangerous incident, "As someone who has been personally impacted by a defective stroller (sending the front seat face first into the cement), this message comes far too late").

[23] *See* https://annainthehouse.com/mockingbird-stroller-review/ (last accessed May 3, 2023).

[24] *Id.*

broken strollers with the same strollers and telling customers to check their frames if they're cracked instead of recalling the stroller.[25]

34.     The post describes how a "social media frenzy" led to the recall and now leaves customers waiting weeks for the frame reinforcement pieces.[26] Since most customers need a stroller to use immediately, many are forced to purchase new strollers while waiting for the reinforcement pieces.[27]

## PLAINTIFF ALLEGATIONS

### A.     Fjona Dajlani

35.     Plaintiff Fjona Dajlani purchased one of the Strollers, along with Stroller accessories (i.e. rain cover, etc.), for a total of $969.01 from Defendant in or around September 2022.

36.     In or around December 2022, Plaintiff Dajlani became aware of this recall when the wheel of her own Stroller broke entirely. When she went to contact Defendant about the damage, she learned of the recall.

37.     Ms. Dajlani requested a refund from Defendant due to the recall of the Stroller and broken wheels, since she feared that the frame enforcement kit and a new set of wheels would not be enough to keep her children safe. Plaintiff Dajlani did not receive a refund for the Stroller.

38.     Instead, Defendant told Plaintiff Dajlani it would replace her wheels. Defendant further instructed Plaintiff to use the frame enforcer kit to ensure that her stroller would not develop the defect, which led to the recall.

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

39.     In all reasonable probability, Ms. Dajlani would not have purchased one of the Strollers, or would have sought materially different terms, had she known these Strollers were not as safe as Defendant represented. Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Strollers.

**B.     Allison Egan**

40.     Plaintiff Allison Egan originally received Baby Generation's Mockingbird Single Stroller as a gift.

41.     After receiving this gift, Ms. Egan was later persuaded by Defendant's team to join Defendant's "Squad Program" and encouraged to upgrade from her Singler Stroller to the Single-to-Double Stroller sometime in 2022 through a series of emails. Defendant's online customer service sent her a discount code and she paid approximately $414.38 for her upgraded stroller and additional accessories (*i.e.*, second seat, ride on board, etc.), that were delivered in or around July 2022.

42.     Soon after Defendant announced its recall, Plaintiff Egan requested a refund from Defendant's customer service team, in or around November, 2022, through the email address provided by Defendant on their recall FAQ page,[28] fearing that the frame enforcement kit would not be enough to keep her toddler and newborn safe. Upon sending this email she received a reply from the "Mail Delivery Subsystem," explaining that the delivery of her email was not complete. Ms. Egan has not received any kind of refund from Defendant.

43.     In all reasonable probability, Ms. Egan would not have used one of the Strollers, or purchased an upgrade or accessories, or would have sought materially different terms, had she

---

[28] hellomockingbird.com/pages/recall (can be found under the FAQ's section: "I have more questions, how can I reach out?") (last accessed May 3, 2023).

known these strollers were not as safe as Defendant represented. Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Stroller.

**CLASS ALLEGATIONS**

44.     Plaintiffs seek to represent a Nationwide class, defined as: "All persons in the United States who purchased or own the Strollers, including the 2nd Seat Kit, the Rider Board and/or infant accessories (the "Class")."

45.     Plaintiff Dajlani also seeks to represent a Subclass defined as: "All persons in New York who purchased or own the Strollers, including the 2nd Seat Kit, the Rider Board and/or infant accessories (the "New York Subclass")."

46.     Plaintiff Egan also seeks to represent a Subclass defined as: "All persons in Massachusetts who purchased or own the Strollers, including the 2nd Seat Kit, the Rider Board and/or infant accessories (the "Massachusetts Subclass")."

47.     At this time, Plaintiffs do not know the exact number of members of the Class or Massachusetts Subclass or New York Subclass; however, given the nature of the claims and the number of retail stores in the United States selling the Strollers, Plaintiffs believes that members of the Class and Subclasses are so numerous that joinder of all members is impracticable.

48.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual Class members include:

a.      Whether Defendant's conduct was unfair, deceptive, and/or misleading under applicable law;

b.      whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class;

c.      whether Defendant breached its express and/or implied warranties to Plaintiffs and the Class;

d.      whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages;

e.      whether Defendant has violated New York Gen. Bus. Law §§ 349 and 350;

f.      whether Defendant made negligent representations with regards to the Strollers; and

g.      whether Defendant has violated Mass. Gen. Laws Ann. Ch. 93A, §§ 2 and 9 of the Massachusetts Consumer Protection Act ("MCPA").[29]

49.     Plaintiffs' claims are typical of those of the Class and Subclasses because Plaintiffs, like all members of the Class and Subclasses, purchased, in a typical consumer setting, Defendant's Strollers and Plaintiffs sustained damages from Defendant's wrongful conduct.

50.     Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and have retained counsel that is experienced in litigating complex consumer protection class actions. Plaintiffs have no interests which conflict with those of the Class or the Subclasses.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

52.     The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate equitable relief with respect to the Class and Subclasses as a whole.

53.     The prosecution of separate actions by members of the Class and Subclasses would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for

---

[29] Plaintiffs have not yet pleaded counts for violation of the MCPA. However, Plaintiffs have sent a demand letter pursuant to Ch. 93A and will amend their Complaint to include these claims should Defendant fail to adequately respond within the statutory time period.

Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and Subclasses even where certain Class members are not parties to such actions.

## COUNT I
### Deceptive Acts Or Practices, New York Gen. Bus. Law § 349

54.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

55.     Plaintiffs bring this claim individually and on behalf of the Class against Defendant. In the alternative, Plaintiff Dajlani brings this claim on behalf of herself and the New York Subclass.

56.     By the acts and conduct alleged herein, Defendant has committed unfair or deceptive acts and practices by making false representations and omissions on the label of the Strollers.

57.     The foregoing deceptive acts and practices were directed at consumers.

58.     The foregoing deceptive acts and practices are misleading in a material way because the Strollers are not in fact safe for children.

59.     Plaintiffs and members of the Class were injured as a result because (a) they would not have purchased the Strollers had they known the truth, and (b) they overpaid for the Strollers on account of the misrepresentations and omissions that the Strollers are not safe for its principal use of safely transporting children.

60.     On behalf of themselves and other members of the class, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT II
### False Advertising, New York Gen. Bus. Law § 350

61.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

62.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant. In the alternative, Plaintiff Dajlani brings this claim on behalf of herself and the New York Subclass.

63.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law because the Strollers are not safe for transporting children.  The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

64.     This misrepresentation has resulted in consumer injury or harm to the public interest.

65.     As a result of this misrepresentation, Plaintiffs and members of the Class have suffered economic injury because (a) they would not have purchased the Strollers had they known the truth, and (b) they overpaid for the Strollers on account of the misrepresentations and omissions that the Strollers are not safe for its principal use of safely transporting children.

66.     On behalf of herself and other members of the class, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### Fraud

67.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

68.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant. In the alternative, Plaintiffs bring this claim on behalf of the New York and Massachusetts Subclasses.

69.     As discussed above, Defendant not only represented that the Strollers are safe for their principal use of safely transporting children but also that the Strollers exceed the required safety standards across nearly every dimension.  However, Defendant failed to disclose to class members the Strollers could not withstand their ordinary use and use of the Strollers could cause severe injury to a child or newborn while using the Strollers.

70.     The false and misleading representations and omissions were made with knowledge of their falsehood.

71.     The false and misleading representations and omissions were made by Defendant, upon which Plaintiffs and members of the Class and Subclasses reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and Class members to purchase the Strollers.

72.     The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Class, who are entitled to damages and other legal and equitable relief as a result.

**<u>COUNT IV</u>**
**Unjust Enrichment**

73.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

74.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant. In the alternative, Plaintiffs bring this claim on behalf of the New York and Massachusetts Subclasses.

75.     Plaintiffs and Class members conferred benefits on Defendant by purchasing the Strollers.

76.     Defendant has knowledge of such benefits.

77.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Strollers.  Retention of those monies under these circumstances is unjust and inequitable because Defendant represented that the Strollers are safe for its principal use of safely transporting children when they are not.

78.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

### COUNT V
**Breach of the Implied Warranty of Merchantability**

79.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

80.     Plaintiffs bring this claim individually and on behalf of members of the Class. In the alternative, Plaintiffs bring this claim on behalf of the New York and Massachusetts Subclasses.

81.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that that the Strollers are merchantable as a stroller.

82.     Defendant breached the warranty implied in the contract for the sale of the Strollers because it could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label."  *See* U.C.C. § 2-314(2) (listing requirements for merchantability).  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

83.     Plaintiffs and Class members purchased the Strollers relying on Defendant's skill and judgment in properly packaging and labeling the Strollers.

84.     The Strollers were not altered by Plaintiffs or Class members.

85.     The Strollers were defective when they left the exclusive control of Defendant.

86.     Defendant knew that the Strollers would be purchased and used without additional testing by Plaintiffs and Class members.

87.     The Strollers were defectively designed and unfit for their intended purpose and Plaintiffs and Class members did not receive the goods as warranted.

88.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because they would not have purchased the Strollers if they knew the truth about the Strollers and that the Strollers they received was worth substantially less than the Strollers they were promised and expected.

89.     On behalf of themselves and other members of the class, Plaintiffs seek damages.

<u>**COUNT VI**</u>
**Breach of Express Warranty**

90.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

91.     Plaintiffs bring this claim individually and on behalf of the members of the Class. In the alternative, Plaintiffs bring this claim on behalf of the New York and Massachusetts Subclasses.

92.     Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted that the Strollers were fit for their intended purpose in that they would function properly as a stroller, and that the Strollers were safe for their principal use of safely transporting children.

93.     In fact, the Strollers do not function properly as a stroller and are not safe for their principal use of safely transporting children.

94.     Plaintiffs and the Class members were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased the Strollers on the same terms if the truth concerning Defendant's Strollers had been known; (b) they paid a price premium due to Defendant's misrepresentations about the Strollers; and (c) the Strollers did not perform as promised.

95.     On behalf of themselves and other members of the class, Plaintiffs seek damages.

### COUNT VII
**Negligent Misrepresentation**

96.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

97.     Plaintiffs bring this claim individually and on behalf of the members of the Class. In the alternative, Plaintiffs bring this claim on behalf of the New York and Massachusetts Subclasses.

98.     As discussed above, Defendant not only represented that the Strollers are safe for their principal use of safely transporting children but also that the Strollers exceed the required safety standards.  However, Defendant failed to disclose that the Strollers are not safe and use of the Strollers could cause severe injury to a child or newborn while using the Strollers.

99.     At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

100.    At an absolute minimum, Defendant negligently misrepresented material facts about the safety of the Strollers.

101.    The negligent misrepresentations made by Defendant, upon which plaintiffs and the Class reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and the Class to purchase the Strollers.

102.    The negligent actions of Defendant caused damage to Plaintiffs and the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class and Subclasses as follows:

A.    For an order certifying the Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclass and Plaintiffs' attorneys as Class Counsel;

B.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs and the Class and/or Subclasses on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For injunctive relief enjoining the illegal acts detailed herein;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief;

H.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  May 4, 2023                    Respectfully submitted,

                                       **KAPLAN FOX & KILSHEIMER LLP**

                                       By:___*/s/ Joel B. Strauss*_____
                                               Joel B. Strauss

800 Third Avenue, 38th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
*jstrauss@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King
Matthew B. George (*pro hac vice* forthcoming)
Blair E. Reed (*pro hac vice* forthcoming)
1999 Harrison Street, Suite 1560
Oakland, CA  94612
Telephone:  415/772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com
kherkenhoff@kaplanfox.com
mgeorge@kaplanfox.com
breed@kaplanfox.com

**WITES & ROGERS**
Marc A. Wites (*pro hac vice* forthcoming)
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: (954) 933-4400
Facsimile: (954) 354-0205
mwites@witeslaw.com

*Attorneys for Plaintiffs*