## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FJONA DAJLANI, ALLISON EGAN, MARITZA LIZARRARAS, HANNAH MCFARLAND, AND ELIZABETH MAHER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BABY GENERATION, INC.,<br><br>Defendant. | Civil Action No.: 1:23-cv-3394-RER-JRC<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Plaintiffs Fjona Dajlani, Allison Egan, Maritza Lizarraras, Hannah McFarland, and Elizabeth Maher ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against defendant Baby Generation, Inc. ("Defendant" or "Baby Generation") for developing, marketing, and distributing defective "Mockingbird" branded Single-to-Double Strollers and Single Strollers (the "Strollers") throughout the United States. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief – based upon, *inter alia*, the investigation made by their attorneys – as to all other matters, as follows:

2.      The Single-to-Double strollers, with the use of an extra attachment, are able to seat two newborns or toddlers, and are generally sold for $450:

1




3.    The Single Strollers seat one newborn or toddler and retail for around $400:




4.    The Strollers do not meet minimum standards of operating with the necessary level of safety due to a defective, unstable frame that has caused the Strollers to crack, at times causing children to fall from the Strollers. This very dangerous defect, which Defendant knew of or should have known and warned customers about, has been experienced and reported by disappointed consumers firsthand after the point of sale.  No reasonable consumer would purchase a premium,

2

expensive stroller to transport babies and toddlers that has or could develop a serious safety defect that could harm their child.

5.      While some consumers can no longer use their Strollers because of the defect, others, whose Strollers do not show damage at this time, now fear for their children's safety because the defect can manifest at any time while in regular use, and some have resorted to purchasing substitute strollers.  Additionally, while there is a significant resale market for used strollers, the defective, recalled Strollers in this case have experienced a significant loss in value and useful life because of these issues.  And, instead of providing a refund for customers with the Strollers, Defendant has only offered a frame reinforcement kit purportedly intended to prevent the Strollers from future breaks. Through this suit, Plaintiffs request a full refund and/or applicable damages on these expensive Strollers, as well as all other appropriate relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject-matter of this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"),  provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendant because it has continuous and systematic contacts with this forum, maintains its corporate headquarters in this District, and the events giving rise to this matter arose of those contacts.

8.      Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information and omissions regarding the Strollers, occurred within this District.  Defendant is also headquartered in this District.

## PARTIES

### A.      Plaintiff Fjona Dajlani

9.      Plaintiff Fjona Dajlani is an individual consumer who, at all times material hereto, was a citizen of New York.

### B.      Plaintiff Allison Egan

10.      Plaintiff Allison Egan is an individual consumer who, at all times material hereto, was a citizen of Massachusetts.

### C.      Plaintiff Maritza Lizarraras

11.      Plaintiff Maritza Lizarraras is an individual consumer who, at all times material hereto, was a citizen of California.

### D.      Plaintiff Hannah McFarland

12.      Plaintiff Hannah McFarland is an individual consumer who, at all times material hereto, was a citizen of Missouri.

### E.      Plaintiff Elizabeth Maher

13.      Plaintiff Elizabeth Maher is an individual consumer who, at all times material hereto, was a citizen of Illinois.

### F.      Defendant Baby Generation, Inc.

14.      Defendant Baby Generation, Inc. is a Delaware corporation with its principal place of business and headquarters in Brooklyn, New York. Defendant has sometimes assumed and/or done business under the brand name Mockingbird while developing, marketing, and selling its

strollers. Defendant manufactures, markets, and distributes the Strollers throughout New York and the United States.

**FACTUAL ALLEGATIONS**

**A.      Baby Generation, Inc. Strollers and Representations**

15.      Baby Generation develops, manufactures, and sells baby carriages, strollers, and stroller accessories. As noted above, the Baby Generation Strollers at issue in this case are the Single-to-Double Stroller and Single Stroller, sold under the brand name Mockingbird. The Strollers are sold online at hellomockingbird.com (Defendant's website)[1], target.com, and babylist.com and sold in person in select Target stores throughout the United States.

16.      The Single to Double Strollers are marketed to safely carry babies and toddlers up to 45 pounds in each seat. They are "expandable" and "multi-function[al]", allowing them to be paired with the "2nd Seat Kit" to carry two children. With a third attachment, the stroller can be used with three children. The third attachment is a "Rider Board", that looks like a scooter and is attached to the back of the Stroller, to the left of where the parent pushes the Stroller. This attachment is recommended for children three to five years old and supports up to 55 pounds. As shown below:

---

[1] Unless otherwise noted, the graphics and quotes included from Defendant's website refer to this web address.



17.     Along with the Stroller, Mockingbird sells a suite of upgrades and accessories. These include a bassinet ($140), a car seat adapter ($45), an infant seat insert ($35), a 2nd seat kit ($145), a riding board ($95), a cup holder ($20), a snack tray ($40), a parent organizer ($30), a seat liner ($25), a rain cover ($25), a footmuff ($60), a hand muff ($40), a mosquito net ($15), and an extra stroller canopy ($60) (collectively, the "Accessories"). With a number of upsells, families can invest hundreds of additional dollars in the Strollers, and they would not have otherwise purchased the Accessories had they known that the Strollers were defective.

18.     The Defendant knows that safety is the paramount consideration of parents purchasing and using its Strollers.  As advertised on Defendant's own website, the Strollers are "meticuously designed for safety" and "exceed the highest testing standards":

## Thoughtfully designed, rigorously tested.

Mockingbird strollers are meticulously designed for safety, and we go above and beyond to ensure that our products meet or exceed the highest testing standards.

6

19.     Defendant represents that the frame has been tested in simulations of irregular surfaces, such as walking over bumps for 72 hours. Defendant also represents that the Strollers have also been tested for a period of 300 hours, undergoing repeated impact and 10,000 simulated sidewalk curb maneuvers to ensure it can withstand knocks and bangs:



## Frame

The irregular surface test simulates walking over bumps for 72 hours; we test for a period of 300 hours. (That's a lot of coffee runs, right?) Our stroller also undergoes repeated impact and 10,000 simulated sidewalk curb maneuvers to ensure it can withstand any knocks and bangs that may come.

20.     Defendant also represents that it follows rigorous testing and safety protocols, including those set forth by the Consumer Product Safety Commission ("CPSC") and ASTM International:

**What testing and safety protocols do you follow?**

We meet (and often exceed) the highest governmental regulations set by the Consumer Product Safety Commission (CPSC) and ASTM International, most recently the ASTM F833-15 standard. Additionally, we choose to certify our products with the Juvenile Product Manufacturers Association (JPMA), and submit all of our fabrics and materials to testing for harmful substances such as lead, phthalates, mercury, and cadmium.

21.     Despite Defendant's representations about its testing and safety compliance, in use the Strollers do not meet the bare minimum standards of operating with the usual and expected level of safety due to a defective, unstable frame that has caused the Strollers to crack and become unusable. These cracks have led to the risk of as well as actual injuries. This defect renders the Strollers worthless and unusable for their intended purpose of safely transporting babies, toddlers, and young children. Additionally, the defective Strollers have experienced a significant diminution in value and useful life due to these undisclosed defects and recalls.

**B.    The Defect and Recall**

22.    As noted above, despite Defendant's representations, the Strollers have developed cracks in the side of their frame, that have allegedly led to falls and injuries and pose a risk of these dangerous events occurring.

23.    On October 28, 2022, Consumer Reports safety experts reportedly "urged" Defendant to recall the Strollers after dozens of parents shared stories about the Stroller suddenly breaking during normal use.[2]  Consumer Reports states that: "Posts on social media and reports submitted to the CPSC describe how some customers had their strollers break without warning while carrying two children, sometimes in the middle of busy city streets. Some parents shared stories about the stroller breaking so suddenly while in motion that their small children, still strapped in their stroller seats, were thrown to the ground."[3]

24.    After Consumer Reports reported on this issue and asked the company about the incidents, Defendant reportedly told consumers that they should inspect the sides of their Stroller frames for cracks.[4] Defendant reportedly told Consumer Reports that the problem was "rare" but that it was working with the CPSC to investigate the incidents and decide on the "next steps." In the meantime, Defendant reportedly continued to sell the strollers without any safety warnings.[5]

25.    Not long after these complaints were brought to Defendant's attention, Defendant stated that they were conducting a voluntary recall on certain Single-to-Double Strollers due to these cracks in the frames of these Strollers.

---

[2] *See https://www.consumerreports.org/babies-kids/baby-product-recalls/* (Last accessed Nov. 2, 2023).

[3] *Id.*

[4] *Id.*

[5] *Id.*

26.    Then, on March 17, 2023, Defendant expanded its recall to include certain Single Strollers.[6]

27.    For all Strollers included in the recall, which could be located by their lot number, Defendant was offering a free "Frame Reinforcement Kit", which includes two small clamps that attach to the Stroller's frame and help prevent future cracks.[7] According to Defendant, it worked on this recall with the US Consumer Products Safety Commission.[8]  However, many consumers were not directly notified by the Defendant about the recall due to Defendant's ineffective notice efforts and because many consumers received the Strollers as gifts.

28.    Defendant reportedly offered anyone who owns a Stroller with a relevant lot number to request and use a Frame Reinforcement kit to prevent these cracks[9]:

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *See* https://hellomockingbird.com/pages/recall (Last accessed Nov. 2, 2023).

At Mockingbird, our top priority is (and always has been) to ensure the safety of you and your little ones. We regularly test our strollers above and beyond the required industry standards, and constantly seek opportunities in our products and testing programs to create even safer strolling.

Despite surpassing the highest governmental regulations for stroller safety, we concluded that under certain circumstances, hairline cracks could potentially form in the stroller frame, and with continued use, pose a fall risk to the children in the stroller. Because of this, out of an abundance of caution we chose to conduct a voluntary recall in partnership with the U.S. Consumer Product Safety Commission.

Although this issue is very unlikely to occur, even the small possibility is preventable by installing our free Frame Reinforcement Kit.

**Please use the "Confirm my Lot Number" button below to check if your stroller's Lot Number is included in this voluntary recall**. If it is, you'll be prompted to request a free Frame Reinforcement Kit, which includes two small steel clamps that attach to your stroller frame and provide an additional layer of strength and durability. The U.S. Consumer Product Safety Commission has reviewed the kit's effectiveness in preventing this rare issue from being able to occur, and has approved it as the official solution for this voluntary recall.

## Request a Frame Reinforcement Kit

Please click the button below to check if your stroller model is included in the recall and to request your free Frame Reinforcement Kit.

29.     Meanwhile, consumers were not the only ones recognizing the dangerousness of these Strollers. Some individuals who purchased their Strollers through Target received the concerning message below urging them to "**please stop using it immediately**" (emphasis in original):

**Your item has been recalled**

Hi Hannah,

We became aware of a product recall involving an item from your order (Order #9176965485589).

- **Recalled item:** Mockingbird Single-to-Double Strollers with a lot number between 20091 and 22602
- **Recall description:** Hazard - The lower side of the stroller frame can crack, posing a fall risk to children in the stroller
- **What to do next:**
    - If you have already received this item, **please stop using it immediately and contact Mockingbird at 877-274-3240 from 9 a.m. to 5 p.m. ET Monday through Friday to receive a free frame reinforcement kit, which includes two frame clamps that attach to the sides of the stroller to reinforce the frame.**
    - For more information about this recall, visit our Product Recalls help page or Product Recalls Facebook page
    - If this item was given to someone else, please notify the recipient as soon as possible and provide the links above

The safety of our guests is our highest priority, and we're sorry for any issues you may have experienced because of this recall. If you have any further questions, please contact us at 1-800-591-3869.

Sincerely,

Target Guest Services

30.     The recall was and is inadequate because there was insufficient notice to impacted consumers and there is no guarantee that the reinforcement kit will prevent the main components of the Stroller from continuing to crack, degrade, and/or cause injuries to children. In fact, there are already reports of reinforcement kits breaking on social media: "Mockingbird snapped even with the enforcement kit that was sent as a fix for their recall.  Be careful mamas!"  *See* ¶ 40, *infra*. Importantly, the recall also does not include refunds or any compensation for the Strollers so that

11

parents can get rid of the defective Strollers and replace them with a safe, non-defective stroller made by another manufacturer.

31.     On information and belief, Plaintiffs allege that Defendant knew about the defect in the Strollers at least six months prior to the recall. On information and belief, Plaintiffs allege that because recalls take time and planning, Defendant would have needed months in advance of the recall in order to determine what Strollers were affected, what the issue exactly was, and to develop and produce the Frame Reinforcement kit.

32.     Moreover, the Strollers' defects and recalls have also caused a significant diminishment of the Strollers' and Accessories' value and useful life that Defendant has not compensated consumers for.  Indeed, the U.S. Consumer Product Safety Commission advises consumers that reselling a recalled product is a violation of federal law, specifically Section 19 of the Consumer Product Safety Act (15 U.S.C. § 2068).[10]  The CPSC advises consumers that risks presented by unsafe strollers include "finger entrapments or amputations from hinge closures, falls from tip-overs or harness/handlebar failures, and other various injuries resulting from failures in the braking or locking mechanisms."  The CPSC then provides a link webpage to advise consumers "to ensure you are not accidentally using, purchasing, or reselling one of these dangerous products."[11]  When the link is accessed, the first two current listings are for Defendant's Strollers and their recalls.  Accordingly, Defendant's conduct has negatively impaired the value of the Strollers and Accessories, caused a loss of regular use and lifespan of the products, and impaired their resale ability.

---

[10] *See* https://www.cpsc.gov/Business--Manufacturing/Business-Education/ResaleThrift-Stores-Information-Center/ (Last accessed Nov. 2, 2023).

[11] *Id.*

33.     As reportedly detailed by one consumer of the Strollers: "[i]t's disappointing that Mockingbird isn't offering its customers a refund as a part of this recall…[a] repair is fine for parents who want to keep their stroller, but if there's a parent who is uncomfortable using the product for their child, they should be able to get their money back."[12]

34.     Another consumer claims on social media that they never would have bought the Stroller if they knew it was this cheaply made:



35.     A consumer who allegedly had three frames break in a row before she finally gave up on the Strollers, reportedly stated that "the reinforcement kit is ridiculous[.] As a parent, I want a product that is strong enough to start, not one I have to add extra material to make safe. It's putting a Band-Aid on a broken bone."[13]

---

[12] *See* https://www.consumerreports.org/babies-kids/baby-product-recalls/mockingbird-single-to-double-stroller-recall  (Last accessed Nov. 2, 2023).

[13] *Id.*

36.     Parents reportedly described their experiences as terrifying close calls as evidenced by these photos showing the defect: [14]



Ealeal Ginott of Queens, N.Y., says her Mockingbird stroller suddenly broke in half while she was pushing two children across a busy city street.
Photo: Ealeal Ginott

---

[14] *Id.*

14





37.    In fact, one consumer allegedly experienced the defect after Defendant had already replaced her Single-to-Double Stroller, stating in a complaint on the CPSC website on September 14, 2022 (and sent to Defendant by the CPSC on September 19, 2022), that when out walking the "[S]troller snapped in half and they both fell to the ground."[15]

38.    What is more, parents describe two types of breaks happening most frequently.[16] The more significant one, where a side of the frame snaps and causes the stroller to collapse, is what the recall addresses and the frame reinforcement kit is meant to prevent.[17] Another type of break, involving a snapped support bar above the basket of the stroller, isn't addressed by the

---

[15] *See* https://saferproducts.gov/PublicSearch/Detail?Report  (Last accessed Nov. 2, 2023).

[16] *See* https://www.consumerreports.org/babies-kids/baby-product-recalls/mockingbird-single-to-double-stroller-recall  (Last accessed Nov. 2, 2023).

[17] *Id.*

recall.[18] A Mockingbird spokesperson previously told Consumer Reports that this smaller part of the frame "is not critical for the stroller's structural integrity."[19]  These issues challenge the efficacy of the alleged reinforcement kit or whether any purported repair or reinforcement could ultimately salvage the Strollers and make them fit and safe for their ordinary use.  Moreover, reasonably consumers would not have purchased these Strollers and Accessories with these sorts of defects and issues.

39.     The frame reinforcement kits have also since been proven to be ineffective. On social media customers describe the uselessness of these reinforcement kits:



[20]

---

[18] *Id.*

[19] *Id.*

[20] Social media post.





40.    Plaintiff MacFarland's Stroller also broke after installment of the enforcement kit:



41.    Despite evidence that the frame reinforcement kits are not effective, Defendant continues to make false and deceptive representations to customers on the safety of these kits:



C.    **Additional Negative Consumer Stroller Reviews**

42.    Prior to and following the recall there were a series of negative reviews about the Strollers. Prior to the recall, one review reportedly states that Consumer Reports' safety experts requested Defendant recall the Strollers "following dozens of reports from parents that their

strollers had broken in dangerous ways. In numerous instances, sudden breaks caused small children to fall face down on the pavement at busy intersections"[21]



[22]

43.    Internet posts detail parents' terrifying experiences with these breaks:

---

[21] *See* https://www.consumerreports.org/babies-kids/strollers/mockingbird-still-selling-strollers-parents-say-break-in-half  (Last accessed Nov. 2, 2023).

[22] *Id.*



**Ealeal Ginott Rodriguez**
September 15, 2022 · 🌐

Still catching my breath over what happened and just how much worse it could have been. Back in autumn, ahead of our second kid's arrival and after hours of online research and comparisons, we ordered a Mockingbird single-to-double stroller. Following the many supply chain hiccups we've all become acquainted with over the past 3 years, it finally shipped at the end of January, arriving at our door-front just in time for our daughter's entry to the world on February 4th. We began using it about two weeks later, in mid-February, after having studied their videos and user manuals and being our ultra-cautious selves.

This afternoon, in the middle of a busy New York City intersection, this stroller that had been in use for barely 7 months, just *snapped in half* as we were crossing the street with our baby and toddler in it, sending my toddler to the asphalt face-first and dragging the seat under the now broken metal frame. Obviously, it could've ended much worse. SO MUCH WORSE. Like, I-have-no-words-in-my-internal-mom-dictionary worse, because my children could've ended up seriously injured or even dead. We are lucky that the light at the intersection had another minute or two left for us to drag stroller and kids off the road onto the sidewalk. We are lucky that there were enough kind strangers around who rushed in to help us ferry our kids and scattered items and stroller parts onto the curb and away from oncoming traffic. We are lucky to have been able to order a Lyft to take us home, since we were now stuck in the middle of the street, away from home, with a baby and a toddler and nowhere to safely put them out of harm's way.

For context, the stroller is meant to hold up to 40 lbs in each seat. Our kids are on the smaller/compact side of the growth chart, with our toddler having finally tipped the scale at 28 lbs and baby weighing barely 14 lbs. Neither is what should be considered a heavy load for this stroller, and our storage basket was holding a small diaper bag, two sports water bottles and some baby blankets. We were crossing a city street, not rough terrain. We have always taken great care to take the stroller on elevators instead of lifting on stairs and subway stations, and have made a point of dismantling seats when packing into cars in order to make sure we would be preserving its shelf-life and safety.

I recommended this stroller to so many friends, and now I just feel terrible, because who knows what might happen. It was terrifying, and I certainly don't want this to happen to anyone else.

21



**Report Summary**

Consumer was walking a 1 YOM and a 1 YOF in a stroller when stroller snapped in half and they both fell to ground. This was a replacement, first stroller support beam broke. Streets are normal. Daughter suffered a rug burn on neck and son had scratches on left hand & foot.

**Product Details**

**Product Description:** The Mockingbird stroller single to double stroller.

**Manufacturer/Importer/Private Labeler Name:** Baby Generation, Inc

**Brand Name:** Mockingbird stroller

**Model Name or Number:** MI4-M2101/A-2132 SILVERIBRONN

**Serial Number:**

**UPC Code:** PO#:5000169

**SKU#:** 202110

**Date Manufactured:** 10/1/2021

**Retailer:** HelloMockingbird.com

**Retailer State:**

**Purchase Date:** 6/6/2022

**Product Category:** Toys & Children

**Product Type:** Strollers & Car Seats

**Product Code:** Baby Strollers (1522)

**Associated Recall**

**Incident Details**

**Incident Description:** I was walking my twins who Just turned 1 in August in the mockingbird stroller and the stroller snapped in half with them in it and they both fell to the ground. This was a replacement stroller that we had for 3 months ( the first stroller support beam broke off which we had for 7months prior). My twins are 18 and 24 lbs. total they don't meet the weight max for one child for the stroller. I was walking them around my neighborhood. The streets aren't uphill- normal sidewalks. I want to report this because this is a new stroller 3 months old and it snapped in half- my daughter had rug burn on her neck and my son had scratches on his left hand and foot.

**Incident Date:** 9/3/2022

**Incident Location:** Street or Highway

---

[23] *See* https://www.saferproducts.gov/PublicSearch/Detail?ReportId=3978072 (Last accessed Nov. 2, 2023).



**Attachments (7)**

**Report Summary**

The Consumer reported that their single to double expandable stroller snapped in half while taking their children (4-year and 2-year old males) to school. Their son ended up facedown in a busy intersection. The Consumer stated this was the 3rd time the frame snapped.

**Product Details**

**Product Description:** Mockingbird single to double stroller

**Manufacturer/Importer/Private Labeler Name:** Baby Generation, Inc

**Brand Name:** Mockingbird

**Model Name or Number:** M2101A-2132 silver/brown

**Serial Number:**

**UPC Code:**

**SKU#:**

**Date Manufactured:** 10/1/2021

**Retailer:** www.mockingbird.com

**Retailer State:**

**Purchase Date:** 4/1/2022

**Product Category:** Toys & Children

**Product Type:** Strollers & Car Seats

**Product Code:** Baby Strollers (1522)

**Associated Recall**

**Incident Details**

**Incident Description:** My Mockingbird single to double stroller snapped in half while taking my children to school. My son ended up facedown in a busy intersection. This is the 3rd time the frame has snapped.

**Incident Date:** 10/24/2022

**Incident Location:** Street or Highway

[24]

44.    Meanwhile, Defendant was posting on Twitter, notifying customers of these complaints but considering them isolated events.[25]  Defendant instructed all customers to inspect their Strollers for cracks and to stop using the Strollers and reach out to the Customer Experience team if cracks developed.[26] Although some Strollers were replaced, many customers expressed on

---

[24] *Id.*

[25] *See* https://twitter.com/mockingbird_us/status/  (Last accessed Nov. 2, 2023).

[26] *Id.*

social media that they still feared using the new Stroller.[27] Customers expressed concern that the Strollers might not show cracks before breaking and some shared their own experiences with sudden breaks in the Strollers' frame.[28] Importantly, informing consumers that they need to wait until a Stroller cracks before taking any further safety precautions does very little to dispel the safety concerns presented by the defective Strollers and continues to put thousands of babies and toddlers at risk of injury. A recalled Stroller with a significant safety defect also diminishes its useful lifespan and impairs its value, including the potential for resale.

45.    Another review reportedly discusses flaws in the Defendant's behavior leading up to the recall process where the customer "saw from the very beginning that the strollers were cheaply made".[29] The customer complains that Defendant treats these as "isolated incidents", when this has been a problem for hundreds of customers.[30] Customer reviews reportedly called Defendant's response to these incidents "shady" since for a while Defendant was replacing the broken strollers with the same strollers and telling customers to check their frames if they're cracked instead of recalling the stroller.[31]

46.    The post describes how a "social media frenzy" led to the recall and now leaves customers waiting weeks for the frame reinforcement pieces.[32] Since most customers need a

---

[27] *See* https://www.consumerreports.org/babies-kids/strollers/mockingbird-still-selling-strollers-parents-say-break-in-half/ (Last accessed Nov. 2, 2023).

[28] *Id.* (A concerned customer stating, "Who's to say it will show cracks before breaking… Accidents happen, but head injuries aren't pleasant either." and another describing a dangerous incident, "As someone who has been personally impacted by a defective stroller (sending the front seat face first into the cement), this message comes far too late").

[29] *See* https://annainthehouse.com/mockingbird-stroller-review/ (Last accessed Nov. 2, 2023).

[30] *Id.*

[31] *Id.*

[32] *Id.*

stroller to use immediately, many are forced to purchase new strollers while waiting for the reinforcement pieces.[33]

**PLAINTIFFS' EXPERIENCES**

**A.      Fjona Dajlani**

47.     Plaintiff Fjona Dajlani purchased one of the Strollers, along with Accessories (i.e., rain cover, etc.), for a total of $969.01 from Defendant in or around September 2022. Plaintiff Dajlani resided in New York at the time of purchase, and was in New York when she made the purchase online, and had the purchase shipped to her residence in Rego Park, New York.

48.     In or around December 2022, Plaintiff Dajlani became aware of this recall when the wheel of her own Stroller broke entirely. When she went to contact Defendant about the damage, she learned of the recall.

49.     Plaintiff Dajlani visited Defendant's website before making her purchase and reviewed Defendant's marketing materials on Defendant's website. Plaintiff Dajlani recalls that Defendant represented the Stroller as safe, and as a result, thought the Strollers were sturdy and safe. Plaintiff Dajlani researched several stroller options before making her purchase, and was persuaded to purchase Defendant's Stroller over other options based on Defendant's representation the Strollers were safe. Plaintiff Dajlani relied on this representation when making her purchase.

50.     Ms. Dajlani's stroller lot number is CH21989, and it was affected by the recall.

51.     Ms. Dajlani requested a refund from Defendant due to the recall of the Stroller and broken wheels, since she feared that the frame enforcement kit and a new set of wheels would not be enough to keep her children safe. Plaintiff Dajlani did not receive a refund for the Stroller.

---

[33] *Id.*

52.     Instead, Defendant told Plaintiff Dajlani it would replace her wheels. Defendant further instructed Plaintiff to use the frame reinforcement kit to ensure that her Stroller would not develop the defect, which led to the recall.

53.     Ms. Dajlani would not have purchased one of the Strollers and Accessories, or would have sought materially different terms, had she known these Strollers were defective and not as safe as Defendant represented. Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Strollers and Accessories.

**B.     Allison Egan**

54.     Plaintiff Allison Egan originally received Baby Generation's Mockingbird Single Stroller as a gift.

55.     After receiving this gift, Ms. Egan was later persuaded by Defendant's team to join Defendant's "Squad Program" and encouraged to upgrade from her Single Stroller to the Single-to-Double Stroller sometime in 2022 through a series of emails. Defendant's online customer service sent her a discount code and she paid approximately $414.38 for her upgraded Stroller and additional Accessories (i.e., 2nd Seat Kit, riding board, etc.), that were delivered in or around July 2022.

56.     Ms. Egan's stroller lot number is CH21922, and it was affected by the recall.

57.     Soon after Defendant announced its recall, Plaintiff Egan requested a refund from Defendant's customer service team, in or around November, 2022, through the email address provided by Defendant on their recall FAQ page,[34] fearing that the frame enforcement kit would not be enough to keep her toddler and newborn safe. Upon sending this email she received a reply

---

[34] hellomockingbird.com/pages/recall (can be found under the FAQ's section: "I have more questions, how can I reach out?") (Last accessed Nov. 2, 2023).

from the "Mail Delivery Subsystem", explaining that the delivery of her email was not complete. Ms. Egan has not received any kind of refund from Defendant.

58.     Ms. Egan would not have used one of the Strollers, or purchased an upgrade or Accessories, or would have sought materially different terms, had she known these Strollers were defective and not as safe as Defendant represented. Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Stroller and Accessories.

**C.     Maritza Lizarraras**

59.     Plaintiff Lizarraras was originally gifted one of the Single Strollers, that was purchased by her mother for $375.38, from Defendant, in August 2020.  In September 2020, Plaintiff Lizarraras determined she wanted to upgrade to the Single-to-Double Stroller, which was effectuated after an additional payment of approximately $45 to Defendant.

60.     Plaintiff Lizarraras also purchased Accessories for her Stroller. In October 2020, Plaintiff Lizarraras purchased a bassinet (sometimes called the carriage) from Defendant for $107.25, via a gift card.  In or around late 2020 or early 2021, she purchased a cup holder for approximately $15-20.

61.     Plaintiff Lizarraras made these purchases in California, and received the purchases in California.

62.     Plaintiff Lizarraras visited Defendant's website and reviewed Defendant's marketing materials on Defendant's website before making these purchases. Plaintiff Lizarraras recalls seeing that Defendant represented the Stroller as "rigorously tested" for safety and claimed that the Strollers "exceed the highest testing standards." Based on these representations, Plaintiff Lizarraras thought that the Strollers were sturdy and safe. Plaintiff Lizarraras relied on these representations when making her purchases.

63.    Plaintiff Lizarraras has experienced issues with the Stroller such as the Stroller failing to close and fold properly.  She has tried to troubleshoot the issue by watching tutorials but was still unable to get it to close properly.  Because she could not get it to close properly, she could not get the Stroller to be stored in an area that was inaccessible from her young child.  After experiencing these issues, Ms. Lizarraras was concerned that the unsecured Stroller could pose a safety risk for her child.

64.    In July 2022, Plaintiff Lizarraras contacted Defendant for customer support, including telling them that the Stroller was unable to be folded and stored properly.  Defendant responded by telling her that she was outside of her return window and suggested selling it on Facebook Marketplace where Defendant claimed that its "gear is in high demand" and that "there is quite a lively market for lightly-used Mockingbird gear online."

65.    Due to the ongoing problems with her Mockingbird Stroller, on July 7, 2022, Plaintiff Lizarraras purchased a replacement stroller from another manufacturer for $220.44.  Purchasing a replacement stroller from another manufacturer has increased her damages and losses due to Defendant's conduct.

66.    Ms. Lizarraras's stroller lot number is CH20516, and it was affected by the recall.

67.    Plaintiff Lizarraras became aware of the recall in October of 2022, via an email notice.  Defendant never provided her with the frame reinforcement kit.

68.    Due to her concerns about the safety of the Stroller, Plaintiff Lizarraras has ceased using it and has been unable to resell the Stroller.

69.    Ms. Lizarraras would not have purchased one of the Strollers and Accessories (and/or not requested the Strollers as a gift), or would have sought materially different terms, had she known these Strollers were defective and not as safe as Defendant represented. Defendant's

28

misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase (and/or request the Strollers as a gift) the Strollers and Accessories.

70.     Prior to bringing this suit, on August 16, 2023, via undersigned counsel, Defendant was provided with a notice pursuant to the California Consumer Legal Remedies Act., Cal. Civ. Code. § 1750.

**D.      Hannah McFarland**

71.     Plaintiff McFarland purchased one of the Single-to-Double Strollers, along with Accessories (i.e. car seat adapter), for approximately $526.34 from Target in April 2022. Plaintiff McFarland resided in Missouri at the time of purchase, and was in Missouri when she made the purchase online, and had the purchase shipped to her residence in Wildwood, Missouri.

72.     Plaintiff McFarland visited Defendant's website before making her purchase and reviewed Defendant's marketing materials on Defendant's website. Plaintiff McFarland recalls that Defendant represented the Stroller as safe. Based on this representation, Plaintiff McFarland thought that the Strollers were sturdy and safe. Plaintiff McFarland relied on this representation when making her purchase.

73.     Ms. McFarland's stroller lot number is CH21903, and it was affected by the recall.

74.     Plaintiff McFarland became aware of Mockingbird's Stroller recall in approximately November 2022 when she received a recall alert via email from Target. The recall notice described the problem as: "Hazard – The lower side of the stroller frame can crack, posing a fall risk to children in the stroller."  She was instructed to "**please stop using it immediately and contact Mockingbird**" (original emphasis).  She then contacted Defendant and received the frame reinforcement kit in December 2022 which she installed on the Stroller.

75.    After learning about the recall, Ms. McFarland felt that using the Stroller was a safety risk for her children.  Accordingly, she started using it less and has seen concerns of other young parents about the safety of the Strollers posted on social media.

76.    In November 2023, when Plaintiff McFarland went to use the Stroller, the frame cracked in half near the brake:



77.    Plaintiff McFarland would not have purchased one of the Strollers and Accessories, or would have sought materially different terms, had she known these Strollers were defective and not as safe as Defendant represented. Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Stroller and Accessories.

**E.    Elizabeth Maher**

78.    Plaintiff Maher was gifted one of the Single Stollers in or around August 2019, as well as some Accessories including, a foot muff (retail $60), car seat adapter (retail $30), parent organizer (retail $20), mosquito net (retail $10), and infant seat insert (retail $30).  Subsequently,

Plaintiff Maher purchased a Single-to-Double Stroller and a 2nd Seat Kit, for approximately $447.79 from Defendant in January 2022, after receiving a credit of $120 for participating in Mockingbird's upgrade program. Plaintiff Maher resided in Illinois at the time of purchase, and was in Illinois when she made the purchase of the Single-to-Double Stroller and a 2nd Seat Kit online, and had the purchase shipped to her residence in Chicago, Illinois. As part of the upgrade program, Plaintiff Maher understood that she was supposed to give her original Single Stroller away, which she did.  Plaintiff also purchased various accessories from Mockingbird, Target, Ebay, and Goodbuy Gear, including the carriage (retail $80), seat liner (retail $14), car seat adapter (retail $23), riding board (retail $95), cup holder (retail $20), and snack tray (retail $25).  Plaintiff Maher spent approximately over $700 on her Single-to-Double Stroller and Accessories.

79.     Plaintiff Maher visited Defendant's website and reviewed Defendant's marketing materials on Defendant's website before making these purchases. Plaintiff Maher recalls seeing that Defendant represented the Stroller as "rigorously tested" for safety and claimed that the Strollers "exceed the highest testing standards." Based on these representations, Plaintiff Maher thought that the Strollers were sturdy and safe. Plaintiff Maher relied on these representations when making her purchases.

80.     Ms. Maher's stroller lot number is CH21945, and was affected by the recall.

81.     Plaintiff Maher became aware of Mockingbird's Stroller recall in approximately late October or early November 2022 from social media. She then contacted Defendant and received the frame reinforcement kit in November 2022 which she installed on the Stroller.

82.     After learning about the recall, Ms. Maher felt that using the Stroller was a safety risk for her children.  She stopped using it until the frame reinforcement kit arrived.  She continued to use it with the reinforcement kit, although only as a Single Stroller and never puts two children in it. She maintains concerns about its safety, particularly with more than one kid riding in it.

31

Plaintiff Maher has seen concerns of other parents about the safety of the Strollers posted on social media, including photos of cracked Strollers and firsthand accounts of broken Strollers.

83.    Plaintiff Maher would not have purchased one of the Strollers and Accessories, or would have sought materially different terms, had she known these Strollers were defective and not as safe as Defendant represented.   Defendant's misrepresentations and omissions were substantial factors in Plaintiff's decisions to purchase the Stroller and Accessories.

## CLASS ALLEGATIONS

84.    Plaintiffs seek to represent a Nationwide class, defined as: "All persons in the United States who purchased and/or own the Strollers and Accessories (the "Class")."

85.    Plaintiff Dajlani also seeks to represent a Subclass defined as: "All persons in New York who purchased and/or own the Strollers and Accessories (the "New York Subclass")."

86.    Plaintiff Egan also seeks to represent a Subclass defined as: "All persons in Massachusetts who purchased and/or own the Strollers and Accessories (the "Massachusetts Subclass")."

87.    Plaintiff Lizarraras also seeks to represent a Subclass defined as: "All persons in California who purchased and/or own the Strollers and Accessories (the "California Subclass")."

88.    Plaintiff McFarland also seeks to represent a Subclass defined as: "All persons in Missouri who purchased and/or own the Strollers and Accessories (the "Missouri Subclass")."

89.    Plaintiff Maher also seeks to represent a Subclass defined as: "All persons in Illinois who purchased and/or own the Strollers and Accessories (the "Illinois Subclass")."

90.    At this time, Plaintiffs do not know the exact number of members of the Class or New York Subclass, Massachusetts Subclass, California Subclass, Missouri Subclass, or Illinois Subclass; however, given the nature of the claims and the number of retail stores in the United

32

States selling the Strollers, Plaintiffs believe that members of the Class and Subclasses are so numerous that joinder of all members is impracticable.

91.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual Class members include:

a.    Whether Defendant's conduct was unfair, deceptive, and/or misleading under applicable law;

b.    whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class;

c.    whether Defendant breached its express and/or implied warranties to Plaintiffs and the Class;

d.    whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages; and

e.    whether Defendant has violated the state consumer protection laws alleged in this complaint.

92.    Plaintiffs' claims are typical of those of the Class and Subclasses because Plaintiffs, like all members of the Class and Subclasses, purchased and used, in a typical consumer setting, Defendant's Strollers and Accessories and Plaintiffs sustained damages from Defendant's wrongful conduct.

93.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and have retained counsel that is experienced in litigating complex consumer protection class actions.  Plaintiffs have no interests which conflict with those of the Class or the Subclasses.

94.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

95.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate equitable relief with respect to the Class and Subclasses as a whole.

96.    The prosecution of separate actions by members of the Class and Subclasses would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and Subclasses even where certain Class members are not parties to such actions.

**COUNT ONE**
**Deceptive Acts Or Practices, New York Gen. Bus. Law § 349**

97.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

98.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant. In the alternative, Plaintiff Dajlani brings this claim on behalf of herself and the New York Subclass.

99.    By the acts and conduct alleged herein, Defendant has committed unfair or deceptive acts and practices by making false representations and omissions regarding the Strollers.

100.    The foregoing deceptive acts and practices were directed at consumers.

101.    The foregoing deceptive acts and practices are misleading in a material way because the Strollers contain significant safety defects are not in fact safe for children.

102.    Plaintiffs and members of the Class were injured as a result because (a) they would not have purchased and used the Strollers and Accessories had they known the truth; (b) they overpaid for the Strollers and Accessories on account of Defendant's misrepresentations and

omissions; and (c) their Strollers and Accessories have experienced a significant loss in use and value because of Defendant's misrepresentations and omissions.

103.    On behalf of themselves and other members of the class, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

## COUNT TWO
### False Advertising, New York Gen. Bus. Law § 350

104.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

105.    Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant. In the alternative, Plaintiff Dajlani brings this claim on behalf of herself and the New York Subclass.

106.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law because the Strollers are not safe for transporting children.  The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

107.    This misrepresentation has resulted in consumer injury or harm to the public interest.

108.    As a result of this misrepresentation, Plaintiffs and members of the Class have suffered economic injury because (a) they would not have purchased and used the Strollers and Accessories had they known the truth; (b) they overpaid for the Strollers and Accessories on account of Defendant's misrepresentations and omissions; and (c) their Strollers and Accessories

have experienced a significant loss in use and value because of Defendant's misrepresentations and omissions.

109.    On behalf of themselves and other members of the class, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

## COUNT THREE
### Unlawful, Unfair and Fraudulent Business Acts and Practices
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

110.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

111.    Plaintiff Lizarraras brings this claim on behalf of herself and the California Subclass.

112.    Defendant's acts and practices constitute unlawful, unfair, and fraudulent business practices in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* The application of the Unfair Competition Law to the putative Class in this action is appropriate because Defendant's wrongful conduct alleged herein, includes but is not limited to Defendant's marketing and sale of defective, unsafe Strollers in the state of California.

113.    Defendant engaged in fraudulent, unlawful and unfair business practices in violation of the Unfair Competition Law by, among other things:

a.    Designing, manufacturing, marketing and selling Strollers and Accessories to consumers that contained material, fundamental defects without disclosing such defects to consumers;

b.    Marketing and selling Strollers and Accessories that were not merchantable for the purpose of providing safe transportation for infants and small children;

36

c.    Marketing and selling Strollers and Accessories while concealing material facts from Plaintiff and Class members regarding the defects in the Strollers that would manifest both within and outside their express or implied warranty periods that would create a safety risk for Plaintiff and California Subclass members who purchased the Strollers to provide safe transportation for infants and small children;

d.    Concealing from California Subclass members that Defendant was in breach and intended to breach its warranty obligations as set forth in this complaint;

e.    Violating additional laws and regulations as set forth herein; and

f.    Breaching its implied warranties with Class members as set forth herein.

114.    Defendant's conduct was also unlawful because it violated the Song-Beverly Consumer Warranty Act, California Consumer Legal Remedies Act, California False Advertising Law, and/or other state consumer protection and warranty laws as alleged herein, as well as several safety laws applicable to strollers, including but not limited to:

a.    16 C.F.R. part 1227: The official CPSC regulation governing "Safety Standard for Carriages and Strollers";

b.    ASTM F833-21: The voluntary safety specification which provides the technical testing methods; and

c.    Consumer Product Safety Improvement Act (CPSIA) of 2008: The overarching law that requires the CPSC to create mandatory standards for durable infant products.

115.    Defendant's conduct also constitutes an unfair business practice under the Unfair Competition Law because the utility of its conduct as described in this Complaint is outweighed by the gravity of the consequences to Plaintiffs and California Subclass members and because

37

Defendant's conduct as described in this Complaint is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff and California Subclass members.

116.   Plaintiff and California Subclass members reasonably and justifiably relied on Defendant's conduct alleged herein. Had Defendant disclosed the existence of the defect in Strollers in its advertising and marketing, Plaintiff and California Subclass members would have learned of the true nature of the Strollers and would have acted differently. Had Plaintiff California Subclass known about the true state of facts of the Strollers, they either would not have purchased the Strollers, or else would have paid substantially less for them. Accordingly, Plaintiff and California Subclass overpaid for their Strollers and did not receive the benefit of their bargain

117.   Plaintiff Lizarraras, on behalf of herself and California Subclass members, has suffered injury in the form of lost money and property, including but not limited to a diminishment in the value and useful life of the Strollers and Accessories, as a direct and proximate result of Defendant's fraudulent, unlawful and unfair business practices and is therefore entitled to equitable relief, including restitution, disgorgement of profits Defendant obtained from its fraudulent, unlawful and unfair business practices, and a permanent injunction that enjoins Defendant from the unlawful practices described herein, as well as attorneys' fees and costs of suit.  Cal. Bus. & Prof. Code § 17203.

**COUNT FOUR**
**Unlawful Practice in Sale of Consumer Goods in Violation of**
**California Consumers Legal Remedies Act**
**(Cal. Civ. Code §§ 1750 *et. seq.*)**

118.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

119.   Plaintiff Lizarraras brings this claim on behalf of herself and the California Subclass.

120. Plaintiff and the Class members are "consumers" that purchased "goods" in the form of the Strollers and Accessories within the meaning of California Civil Code section 1761. The application of the California Consumer Legal Remedies Act to the putative California Subclass in this action is appropriate because Defendant's wrongful conduct alleged herein, includes but is not limited to Defendant's marketing and sale of defective, unsafe Strollers in the state of California.

121. Defendant is a "person" within the meaning of California Civil Code section 1761(c).

122. Defendant violated California Consumer Legal Remedies Act, Civil Code section 1770(a)(5) by representing that the Strollers and Accessories have characteristics, uses or benefits, which they do not have, and Civil Code section 1770(a)(7) by representing that the Strollers and Accessories are of a particular standard, quality, or grade, even though they are of another. Such conduct includes, among other things:

a. Designing, manufacturing, marketing, and selling Strollers and Accessories to consumers that contained material, fundamental defects without disclosing such defects to consumers;

b. Marketing and selling Strollers and Accessories that were not merchantable for the purpose of providing safe transportation for infants and small children;

c. Marketing and selling Strollers and Accessories while concealing material facts from Plaintiff and California Subclass members regarding the defects in the Strollers that would manifest both within and outside their express or implied warranty periods that would create a safety risk for Plaintiff and California Subclass members who purchased the Strollers to provide safe and reliable transportation for their infants and small children;

d. Concealing from California Subclass members that Defendant was in

39

breach and intended to breach its warranty obligations as set forth in this complaint.

123.     Pursuant to California Civil Code sections 1752, 1780, and 1781, Plaintiff, on behalf of herself and other Class members, seek an order of this Court enjoining Defendant from the unlawful practices described herein and seek monetary relief from Defendant to provide actual, compensatory, statutory, and/or punitive damages, as well as an award of costs of litigation and attorneys' fees. Plaintiff sent a CLRA notice of violation and demand letter on August 16, 2023, a copy of which is attached hereto as **Exhibit A**. Defendant, via its counsel in this action, acknowledged receipt of the notice of CLRA violations and rejected Plaintiff's claims.

## <u>COUNT FIVE</u>
**Violation of California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.***

124.     Plaintiffs re-allege each and every allegation contained above, and incorporate by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

125.     Plaintiff Lizarraras brings this claim on behalf of herself and the California Subclass.

126.     Each of the above deceptive and misleading advertising practices of Defendant set forth above constitutes untrue or misleading advertising under the California False Advertising Law ("FAL"), California Business & Professions Code section 17500, *et seq.*

127.     At all material times, Defendant's statement, marketing, and advertising materials misrepresented or omitted to state material facts regarding the safety of Defendant's Strollers as set forth herein this Amended Complaint.  Defendant is disseminating statements, marketing and advertising concerning the safety of its Strollers that are unfair, untrue, deceptive, or misleading within the meaning of California Business & Professions Code section 17500, *et seq.* Defendant's acts and practices have deceived and/or are likely to continue to deceive Plaintiff, members of the California Subclass, and the public. As set forth above, Defendant's safety and quality claims are deceptive and misleading to reasonable consumers because the frame of the Stroller is defective,

making the Stroller extremely hazardous, and neglecting to meet average standards of safety. Moreover, Defendant intentionally does not disclose any of this information to consumers and instead represents that the stroller is beyond average levels of safety.

128.    In making and disseminating the statements alleged herein, Defendant knew or should have known its advertisements were deceptive and misleading.  Plaintiff and members of the California Subclass based their decisions to purchase and use Defendant's Strollers and Accessories because of Defendant's misrepresentations and omissions of material facts.

129.    Plaintiff and California Subclass members are entitled to relief, including enjoining Defendant to cease and desist from engaging in the practices described herein, as well as a declaration of rights that Defendant's safety claims are deceptive and misleading.

**COUNT SIX**
**Violation of The Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790 *et seq.***

130.    Plaintiffs re-allege each and every allegation contained above, and incorporate by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

131.    Plaintiff Lizarraras brings this claim on behalf of herself and the California Subclass.

132.    Defendant violated the Song-Beverly Consumer Warranty Act by, among other things, violating the implied warranties of merchantability by knowingly selling defective Strollers that are unsuitable for their expected use in violation of sections 1791.1 and 1791.2, and were therefore not fit for the ordinary purpose for which the goods were intended to be sold.

133.    Defendant's attempts to disclaim or limit the implied warranty of merchantability *vis-à-vis* consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold defective products without informing consumers about these safety concerns. Moreover, Defendant was provided notice of these issues by numerous complaints lodged by consumers.

134.    Plaintiff and California Subclass members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendants conduct described herein.

135.    Plaintiff seeks restitution and damages as a result of Defendant's unlawful conduct, as well as attorneys' fees and costs of suit.

**COUNT SEVEN**
**Violation of Massachusetts's Consumer Protection Act**
**M.G.L.A. Chapter 93A**

136.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

137.    Plaintiff Egan brings this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

138.    Plaintiff, Class Members, and Defendant are "persons" under the Massachusetts Consumer Protection Act pursuant to M.G.L.A. Chapter 93A, § 1(a).

139.    Defendant was engaged in trade or commerce in marketing and selling the Class Strollers pursuant to M.G.L.A. Chapter 93A, § 1(b).

140.    At all relevant times, Defendant has committed and continues to commit unfair and deceptive business acts and practices as detailed herein, in violation of M.G.L.A. Chapter 93A, §§ 2 and 9.

141.    Defendant's advertising, labeling, packaging, marketing and/or sale of the Strollers and Accessories to Plaintiff Egan and the members of the Massachusetts Subclass was made with a material, knowing, and/or willful misrepresentation that the Strollers were safe constitutes an unfair and deceptive practice.

142.    Plaintiff Egan and the members of the Massachusetts Subclass purchased the Strollers and Accessories under the conditions described herein. As a direct result of Defendant's

unfair and deceptive business conduct, Plaintiff Egan and the members of the Massachusetts Subclass have sustained monetary damages, including purchasing and using the Strollers and Accessories, or, alternatively, paying more than they would have had they known the truth about the Strollers.

143.     Demand on behalf of Plaintiff Egan and the Massachusetts Subclass was made upon Baby Generation more than 30 days before the filing of this Complaint, pursuant to M.G.L.A. Chapter 93A, §§ 2 and 9, and for relief under Chapter 93A, and Baby Generation failed to offer relief that is fair and reasonable in relation to the injury suffered by Plaintiff Egan and the Massachusetts Subclass.

144.     By engaging in the conduct described above, Defendant violated at least 940 Code Mass. Regs. § 3.16 of the General Regulations of the Massachusetts Attorney General, which provides that "[w]ithout limiting the scope of any other rule, regulation or statute, an act or practice is a violation of Chapter 93A, § 2 if: (1) it is oppressive or otherwise unconscionable in any respect; or (2) [a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; (3) [i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or (4) [i]t violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of [M.G.L.A. Chapter 93A, § 2.]" Defendant's violation of this regulation constitutes a further violation of M.G.L.A. Chapter 93A.

145.     By engaging in the conduct described above, Defendant also violated Mass. Regs. § 3.02 of the General Regulations of the Massachusetts Attorney General, which provides that

"[n]o statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another." Defendant's violation of this regulation constitutes a further violation of M.G.L.A. Chapter 93A.

146. On behalf of herself and other members of the Massachusetts Subclass, Plaintiff Egan respectfully requests that this Court enter judgment against Defendant for its violations of M.G.L.A. Chapter 93A and award damages to adequately compensate her and the Massachusetts Subclass. Plaintiff Egan and the Massachusetts Subclass also respectfully request that this Court declare that the acts and practices of Defendant described herein were committed willfully, knowingly and/or in bad faith in violation of M.G.L.A. Chapter 93A, §§ 2 and 9, and that in accordance with M.G.L.A. Chapter 93A, the Court treble the amount of the Judgment and add thereto court costs and attorneys' fees.

**COUNT EIGHT**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505,** *et seq.*

147. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

148. Plaintiff Maher brings this claim individually and on behalf of the members of the Illinois Subclass against Defendant.

149. Plaintiff Maher, Illinois Subclass members, and Defendant are all "persons" within the meaning of the Illinois Consumer Fraud and Deceptive Practices Act. Plaintiff Maher and the Illinois Subclass members are "consumers" within the meaning of the Illinois Consumer Fraud and Deceptive Practices Act. Defendant's Strollers and Accessories were directly offered to the

44

public for sale and constitute "merchandise" within the meaning of the Illinois Consumer Fraud and Deceptive Practices Act. Defendant's marketing and sale of Strollers and Accessories in the state of Illinois constitutes "trade" and/or "commerce" within the meaning of the Illinois Consumer Fraud and Deceptive Practices Act.

150.    Defendant's acts or omissions, as alleged herein, constitute unfair methods of competition and unfair or deceptive acts in practices that occurred in connection with the sale and or advertisement of merchandise, in violation of section 505/2 of the Illinois Consumer Fraud and Deceptive Practices Act, that prohibits "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965…"  815 Ill. Comp. Stat. Ann. 505/2.

151.    Defendant violated the Illinois Consumer Fraud and Deceptive Practices Act by, among other things:

a.    Designing, manufacturing, marketing and selling Strollers and Accessories to consumers that contained material, fundamental defects without disclosing such defects to consumers;

b.    Marketing and selling Strollers and Accessories that were not merchantable for the purpose of providing reliable and safe transportation for infants and small children;

c.    Marketing and selling Strollers and Accessories while concealing material facts from Plaintiff and Class members regarding the defects in the Strollers that would manifest both within and outside their express or implied warranty periods that would create a safety risk for Plaintiff and Class members who purchased the Strollers to provide reliable transportation for infants and young children;

45

d.      Concealing from Class members that it was in breach and intended to breach its warranty obligations as set forth in this complaint.

e.      Violating additional laws and regulations as set forth herein; and

f.      Breaching its express and implied warranties with Class members as set forth herein.

152.    Under Section 505/10a, Plaintiff Maher and the Illinois Subclass have suffered actual damages and ascertainable losses by Defendant's conduct, entitling them to recover compensatory damages, restitution, disgorgement, refunds of moneys, interest, punitive damages, injunctive relief, reasonably attorneys' fees, costs of suit, and any and all relief that may be available in law or equity.

## COUNT NINE
### Violation of Missouri's Merchandising Practices Act

153.    Plaintiffs re-allege each and every allegation contained above, and incorporate by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

154.    Plaintiff McFarland brings this claim individually and on behalf of the Missouri Subclass for Defendant's violations of the Missouri's Merchandising Practices Act ("MMPA").

155.    The MMPA "is designed to regulate the marketplace to the advantage of those traditionally thought to have unequal bargaining power as well as those who may fall victim to unfair practices." *Huch v. Charter Commc'ns Inc.*, 290 S.W. 3d 721, 725 (Mo. banc. 2009). The MMPA provides that it is unlawful to "act, use or employ . . . deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ." § 407.020.1, RSMo.

156.    Defendant's conduct as described above constitutes the act, use or employment of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices and/or the

46

concealment, suppression, or omission of any material facts in connection with the sale or advertisement of any merchandise in trade or commerce in that Defendant represents that its Strollers are beyond the average level of safety, when in fact they are defective and do not meet this minimum standard. Among other things, Plaintiff and members of the Classes were misled because they believed that they were extremely safe and high-quality Strollers. As such, the Strollers were marketed in a misleading and deceptive way.

157.    Defendant's misrepresentations and omissions as set forth in this Complaint are material in that they relate to matters that are important to consumers and/or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff McFarland and members of the Missouri Subclass.

158.    In violation of the MMPA, Defendant employed fraud, deception, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts in its sale and advertisement of the Strollers.

159.    Plaintiff McFarland and members of the Missouri Subclass purchased and used the Strollers and Accessories for the purpose of transporting their infants and small children.

160.    Plaintiff McFarland and the Missouri Subclass members suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Strollers as purchased was less than the value of the Strollers as represented, and it continues to decline due to the defects and recalls. Had Plaintiff and members of the Missouri Subclass known the truth about the Strollers, they would not have purchased or used the Strollers and Accessories, or would have purchased the Strollers and Accessories on different terms.

161.    As authorized under § 407.025.2, RSMo Plaintiff McFarland seeks, on behalf of herself and the Missouri Subclass, the award of punitive damages, attorney's fees, and equitable relief deemed necessary or proper, according to the court's discretion.

47

## COUNT TEN
### Unjust Enrichment

162.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

163.    Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant. In the alternative, Plaintiffs Dajlani, Lizarraras, McFarland, and Maher bring this claim on behalf of the New York, California, Missouri, and Illinois Subclasses.

164.    Plaintiffs and Class members conferred benefits on Defendant by purchasing the Strollers.

165.    Defendant has knowledge of such benefits.

166.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Strollers.  Retention of those monies under these circumstances is unjust and inequitable because Defendant represented that the Strollers are safe for its principal use of safely transporting children when they are not.

167.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT ELEVEN
### Breach of the Implied Warranty of Merchantability

168.    Plaintiffs Maher and McFarland incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

169.    Plaintiffs Maher and McFarland bring this claim individually and on behalf of the Missouri (MO ST 400.2-314) and Illinois (810 ILL. COMP. STAT. 5/2-314, 810 ILL. COMP. STAT. 5/2A-212) Subclasses.

170.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Strollers are merchantable as a stroller.

171.    Defendant breached the warranty implied in the contract for the sale of the Strollers because it could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiffs and Subclass members did not receive the goods as impliedly warranted by Defendant to be merchantable.

172.    Plaintiffs and Subclass members purchased the Strollers relying on Defendant's skill and judgment in properly packaging and labeling the Strollers.

173.    The Strollers were not altered by Plaintiffs or Subclass members.

174.    The Strollers were defective when they left the exclusive control of Defendant.

175.    Defendant knew that the Strollers would be purchased and used without additional testing by Plaintiffs and Subclass members.

176.    The Strollers were defectively designed and unfit for their intended purpose and Plaintiffs and Subclass members did not receive the goods as warranted.

177.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Subclass members have been injured and harmed because they would not have purchased the Strollers if they knew the truth about the Strollers and that the Strollers they received were worth substantially less than the Strollers they were promised and expected.

178.    On behalf of themselves and other members of the class, Plaintiffs seek damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class and Subclasses as follows:

A.    For an order certifying the Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel;

B.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs, the Class, and/or Subclasses on all counts asserted herein;

D.    For actual, compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For injunctive relief enjoining the illegal acts detailed herein;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief;

H.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 7, 2026                           Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By:    */s/ Joel B. Strauss*
              Joel B. Strauss

Joel B. Strauss
800 Third Avenue, 38th Floor
New York, NY 10022

50

Telephone:  212-687-1980
Facsimile:  212-687-7714
*jstrauss@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King
Matthew B. George (*pro hac vice*)
Blair E. Reed (*pro hac vice*)
1999 Harrison Street, Suite 1501
Oakland, CA  94612
Telephone:  415/772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com
mgeorge@kaplanfox.com
breed@kaplanfox.com

**WITES & ROGERS**
Marc A. Wites (*pro hac vice* )
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: (954) 933-4400
Facsimile: (954) 354-0205
mwites@witeslaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Joel B. Strauss, hereby certify that, on May 7, 2026, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM/ECF system, which will send electronic notices of the filing to all counsel of record.

/s/ *Joel B. Strauss*
Joel B. Strauss
